

# IN THE
# TENTH COURT OF APPEALS

### No. 10-17-00345-CR

ADAN GAONA,

                                                 **Appellant**

 v.

THE STATE OF TEXAS,

                                                 **Appellee**

---

**From the 18th District Court**
**Johnson County, Texas**
**Trial Court No. F50651**

---

## MEMORANDUM OPINION

---

Appellant Adan Gaona was convicted by a jury of the offenses of murder and tampering with a human corpse. Gaona entered a plea of guilty to a separate charge of possession of between five and fifty pounds of marihuana. The jury assessed punishment on all three counts—life imprisonment for the murder charge, twenty years' imprisonment for the tampering with a human corpse charge, and ten years' imprisonment for the marihuana charge. All sentences were ordered to run concurrently, and a separate judgment was entered for each offense.

After briefing was concluded in this appeal, we directed Gaona's appellate counsel to file an amended brief because the marihuana conviction was not addressed in the initial brief. We directed counsel to address any alleged error attributable to that conviction or to file an *Anders*-type motion to withdraw and supporting brief. *See Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). Gaona's counsel complied and filed a supplemental brief. The State then filed a supplemental reply brief. Gaona subsequently obtained new counsel who has filed a second supplemental brief, and the State has also filed a second supplemental reply brief. Gaona raises a total of six issues in his various briefs. We will affirm.

## Background

Johnson County authorities were notified by Gaona's sister that her stepfather, Antonio Galvan, was missing. The sister told authorities that Gaona was in possession of Galvan's truck and cell phone and that she feared Gaona had harmed Galvan. Deputies went to the rural property outside Alvarado where Gaona resided to investigate. Gaona denied any knowledge of Galvan's location. However, the truck Galvan ordinarily used was parked on the property, and the deputies observed that Gaona was sweating heavily and covered in dirt. Deputies contacted Gaona's mother, the registered owner of the truck, who told them that Gaona did not have permission to drive the truck. Gaona was placed under arrest for driving the truck without authorization, and he was transported to the Johnson County Law Enforcement Center. During booking, officers discovered a plastic baggie in Gaona's pocket containing three

spent shell casings. Deputies also discovered a marihuana grow operation set up in the main house on the property. The marihuana was valued at over $100,000.

Deputies recovered Galvan's body the next day after a more extensive search of the property. Galvan's body was partially covered with dirt and leaves and was located next to a freshly dug grave. Galvan's body was transported to the Tarrant County Medical Examiner's Office for an autopsy. The autopsy revealed two gunshot wounds to the face—one to the left eye and one to the left cheek. Another gunshot wound was located in the left chest/shoulder area. The two head shots were both fatal wounds. Bullet fragments recovered from Galvan's body and the shell casings taken from Gaona's pocket were consistent with .38 caliber ammunition. Russell Lutz, who lived in a mobile home on the Alvarado property and assisted in the marihuana-grow operation, told deputies that Gaona possessed a .38-caliber pistol and that Gaona had admitted shooting Galvan. Lutz was also taken into custody and subsequently charged with possession of marihuana and tampering with evidence.

*Issues*

In his initial brief, Gaona presents the following issues:

1.      The trial court erred in accepting the jury's verdict as the evidence was insufficient to support the conviction for murder.

2.      The trial court erred in accepting the jury's verdict as the evidence was insufficient to support the conviction for tampering with evidence—corpse.

In his first supplemental brief, Gaona presents the following issue:

1.  The trial court erred in accepting the jury's punishment verdicts as they violate the constitutional provision against cruel and unusual punishment.

Gaona presents the following issues in his second supplemental brief:

1.  The evidence was legally insufficient to support the verdict for murder because (1) the evidence did not show that Gaona killed Galvan as a principal or a party, and (2) the evidence did not show that Gaona acted with the required mental state.

2.  The trial court erred in excluding evidence that Galvan sexually assaulted Gaona's family members.

3.  The trial court erred in instructing the jury that Gaona could be found guilty as a party to Galvan's murder.

*Discussion*

A.  Sufficiency of the Evidence.  The Court of Criminal Appeals has expressed our standard of review of a sufficiency issue as follows:

> When addressing a challenge to the sufficiency of the evidence, we consider whether, after viewing all of the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed.2d 560 (1979); *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017).  This standard requires the appellate court to defer "to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781.  We may not re-weigh the evidence or substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).  The court conducting a sufficiency review must not engage in a "divide and conquer" strategy but must consider the cumulative force of all the evidence. *Villa*, 514 S.W.3d at 232.  Although juries may not speculate about the meaning of facts or evidence, juries are permitted to draw any reasonable inferences from the facts so long as each inference is supported by the evidence presented at trial. *Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016) (*citing Jackson*, 443 U.S. at 319, 99 S.Ct. 2781); *see also Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007).  We presume that the factfinder resolved any conflicting inferences

from the evidence in favor of the verdict, and we defer to that resolution. *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). This is because the jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13.

We measure whether the evidence presented at trial was sufficient to support a conviction by comparing it to "the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge is one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*; *see also Daugherty v. State*, 387 S.W.3d 654, 665 (Tex. Crim. App. 2013). The "law as authorized by the indictment" includes the statutory elements of the offense and those elements as modified by the indictment. *Daugherty*, 387 S.W.3d at 665.

*Zuniga v. State*, 551 S.W.3d 729, 732-33 (Tex. Crim. App. 2018).

1. Murder. A person commits murder if he "intentionally or knowingly causes the death of an individual" or "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE ANN. §§ 19.02(b)(1), (2). Knowledge and intent are almost always proven by circumstantial evidence and may be inferred from a person's acts, words, and conduct, as well as the surrounding circumstances. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). A jury may infer specific intent to kill from use of a deadly weapon in a deadly manner. *Adanandus v. State*, 866 S.W.2d 210, 215 (Tex. Crim. App. 1993). A handgun is a deadly weapon "and when used by a defendant an intent to kill

is presumed." *Williams v. State*, 567 S.W.2d 507, 509 (Tex. Crim. App. 1978); *see also Watkins v. State*, 333 S.W.3d 771, 781 (Tex. App.—Waco 2010, pet. ref'd). Additionally, motive is a significant circumstance indicating guilt. *Guevara*, 152 S.W.3d at 50.

Gaona does not contest that Galvan was murdered. In his initial brief, Gaona asserts that he did not commit the murder. In his second supplemental brief, Gaona asserts that the evidence was insufficient to establish that he was the one who shot Galvan—that the evidence only supports a finding that Gaona acquired the knowledge of Galvan's death after the fact. Gaona also asserts that, even if the evidence permitted the jury to find that he was the shooter, the evidence did not establish that Gaona acted intentionally or knowingly. Gaona contends that if he shot Galvan, the shooting was not intentional because Galvan was not shot at close range. Thus, Gaona argues, "there is no evidence that, if [Gaona] was the shooter, he knew that he was firing toward [Galvan] or even that he knew [Galvan] was downrange from the gun."

There were no witnesses to the murder. The firearm that was used to commit the murder was not found by law enforcement. The shell casings recovered from Gaona's pocket contained no fingerprints, and the shell casings were not subjected to DNA analysis. At the time of his arrest, Gaona had no blood on his hands, clothing, or shoes. However, there was sufficient circumstantial evidence to support the jury's verdict. As previously noted, circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Ramsey*, 473 S.W.3d at 809.

The evidence at trial established that Gaona's mother leased property close to Alvarado containing a house and approximately twenty-two acres. Gaona moved into the house on the property shortly after the lease was finalized. Galvan had visited the property on one occasion while the lease was being negotiated.

Gaona's mother and sister testified that Galvan left his home in Arlington at approximately noon on Saturday, May 21st to assist Gaona with some plumbing issues at the Alvarado property. Galvan told Gaona's mother that he would call Gaona when he was close to the property because he did not know how to get there. No one other than Gaona admitted to seeing Galvan alive after that time.

Gaona drove to his sister's apartment in Arlington around 2:00 p.m. in Galvan's truck. Gaona told his sister that they needed to go talk to their mother because Gaona and Galvan had an argument and Galvan had "walked away." Gaona's sister then drove Gaona to their mother's home. Gaona's mother and sister informed investigating officers that Gaona told them the following: (1) Gaona and Galvan argued over the presence of the marihuana-grow operation at the Alvarado property; (2) Gaona took Galvan's phone to prevent Galvan from taking photographs of the marihuana-grow operation; and (3) Galvan left the Alvarado property without his truck or cell phone and was not coming back. Gaona first told them that Galvan drove away in his truck after the argument, but then said that Galvan walked away when confronted with the fact that his sister saw him driving Galvan's truck. Gaona also threatened to kill himself in front of his mother and sister rather than go to jail if they called the police.

Gaona's sister drove to the Alvarado property to look for Galvan, but no one was there. When the sister returned to her apartment, Galvan's truck was gone. Gaona's sister contacted law enforcement on Sunday, May 22nd at their mother's urging to report Galvan missing.

Lutz testified that when he left the Alvarado property on the morning of May 21st, he saw no one on the property, including Gaona or Galvan. After Lutz returned later that evening, Gaona drove up in a white pickup truck. When Lutz inquired about the truck, Gaona told him that it belonged to Galvan and that Galvan was "dead out in the woods." The next morning, Lutz found Galvan's body in the woods about one hundred yards behind the main house. Lutz and Gaona took steps to bury Galvan's body in the woods.

In a statement to investigating officers, Lutz said that Gaona admitted shooting Galvan. Lutz was less clear about this exchange when he testified but admitted making the statement to investigators. Lutz testified that Galvan had a .38 handgun. Gaona testified that Juan, also known as "Primo" and who was an associate of a drug cartel, kept a .38 revolver and other weapons on the Alvaredo property—"that was his weapons for the house."

A Texas Ranger, who assisted in the investigation, questioned Gaona. The Ranger told Gaona that Galvan's body had been discovered. Gaona responded that he did not own a gun. At that point, it was unclear how Galvan had been killed.

Gaona had no explanation for the shell casings in his pocket other than that he was wearing Lutz's pants.

In a recorded jail conversation between Gaona and his oldest sister, Gaona asked her to tell the witnesses who testified on his behalf to follow his lawyer's defense strategy even if they had to lie.

Gaona raised two defenses at trial: (1) he had an alibi for the time Galvan was murdered; and (2) the drug cartel had Galvan killed because he was skimming money from their drug operation.

Gaona's alibi defense was not supported by the evidence. The medical examiner testified that it was impossible to ascertain the actual time Galvan was killed, but the condition of the body was consistent with Galvan being killed on May 21st.

Gaona testified that he got into the drug trafficking business because of Galvan. Gaona introduced Galvan to Primo, and Primo and Galvan subsequently began partnering in local drug distribution. Gaona testified that he was Galvan's "mule"—that he would deliver drugs and collect money at Galvan's behest. Galvan leased the Alvarado property for the purpose of growing marihuana and using it as a base for distributing drugs. Lutz, a long-time associate of Primo, moved onto the Alvarado property to take care of the marihuana-grow operation.

Gaona testified that the Alvarado property became a major distribution center for drugs smuggled from Mexico by the drug cartel. Gaona testified that the drug cartel suspected Galvan of stealing money from the organization and that the leader of the drug cartel, visited the Alvarado property on Friday, May 20th and announced his intention to kill Galvan. Also present at the discussion were Primo and two others.

Besides the cartel leader, none of the others were members of the cartel, merely associates.

Gaona testified that on Saturday, May 21st he was directed by Galvan to deliver a shipment of narcotics to an individual in Arlington. Gaona used Galvan's truck to move the drugs and left the truck with the keys and drugs inside at his sister's apartment complex. Gaona then had his sister drive him to his mother's residence. Gaona admitted that he lied to his mother and sister about Galvan's location in order to keep his drug activities concealed, but denied that they had any type of argument. Gaona then got a ride from a friend back to his sister's apartment. Gaona testified that the drugs inside the truck had been exchanged for approximately $250,000 in cash. Gaona then transported the money back to the Alvarado property in Galvan's truck. When Gaona arrived, he saw no one on the property. Gaona testified that he placed the money in the house and then left again to assist his brother who had a flat tire. When Gaona returned home, only Lutz was there, and Gaona went to bed.

Gaona testified that the first he learned of Galvan's murder was the next morning, Sunday, May 22nd, when Lutz woke him up to tell him that Primo had killed Galvan. Gaona testified that he was afraid to call the police because of the drug operation, but that he did go with Lutz to Lowe's. Gaona gave Lutz $100 but testified that it was for work Lutz had done with the marihuana on Saturday. Gaona further testified that the grave was mostly dug by Lutz and that he saw Galvan's body for the first time when he assisted Lutz in enlarging the grave.

The only evidence linking Galvan to the cartel was Gaona's testimony. A DPS agent who instructs other law enforcement officers regarding the Mexican drug cartels, testified that the facts of Galvan's murder were inconsistent with the typical murder committed by the cartel. The agent also testified that the marihuana-grow operation on the Alvarado property did not comport with a usual cartel drug operation. In the agent's experience, the cartel would have security around any narcotics operation, and there was no security present on the Alvarado property. Also, the cartel would not allow non-cartel individuals to store their drugs or their money. Nor was there such a thing as being an associate of the cartel—"You're either in it or you're not." In the agent's experience, someone caught stealing from the cartel would be subjected to a gruesome death that would be publicly displayed as an example, not merely being shot and buried in the woods.

As noted, Gaona's second supplemental brief argues that Gaona did not shoot Galvan intentionally and knowingly because Galvan could have been shot from a distance making the shooting somehow accidental. The jury was entitled to infer Gaona's intent to kill Galvan from the two closely placed gunshots to the face. Additionally, there is no evidence, not even in Gaona's testimony, that Gaona was indiscriminately shooting on the Alvarado property while Galvan was there on Saturday, May 21st.

As noted, direct and circumstantial evidence are equally probative. Viewing all the evidence in the light most favorable to the verdict, the jury could rationally find that Gaona murdered Galvan with a firearm beyond a reasonable doubt. Ultimately, the

issue is one of credibility, and, by their verdict, the jury did not find Gaona credible.

We overrule issue one in Gaona's initial brief and issue one in Gaona's second supplemental brief.

2. Tampering with a corpse. Section 37.09 of the Penal Code provides that a person commits an offense if the person, "knowing that an offense has been committed, alters, destroys, or conceals any . . . thing with intent to impair its verity, legibility, or availability as evidence in any subsequent investigation of or official proceeding related to the offense." TEX. PENAL CODE ANN. § 37.09(d)(1); *Hines v. State*, 535 S.W.3d 102, 109 (Tex. App.—Eastland 2017, pet. ref'd). The offense becomes a felony of the second degree if the thing concealed is a human corpse. TEX. PENAL CODE ANN. § 37.09(c). "Actual concealment requires a showing that the allegedly concealed item was hidden, removed from sight or notice, or kept from discovery or observation." *Stahmann v. State*, 548 S.W.3d 46, 57 (Tex. App.—Corpus Christi–Edinburg 2018), *aff'd*, 602 S.W.3d 573 (Tex. Crim. App. 2020).

Gaona admitted during his testimony that he knew Galvan had been murdered, that he and Lutz dug the grave to bury Galvan's body, that he accompanied Lutz to Lowe's to buy lime, and that he gave Lutz the $100 used to buy the lime.

Lutz testified that Gaona told him that Gaona had shot Galvan and that Galvan's body was in the woods behind the house. Lutz further testified that when he first found Galvan's body, it was covered with "bushes." Investigating officers testified that there were two piles of dirt next to the open grave and that Galvan's body was partially

covered by one pile that was also littered with limbs and debris. Lutz further testified that Gaona gave him the $100 specifically to buy the lime.

The jury could infer from the foregoing that Gaona shot Galvan then covered Galvan's body with brush to delay the body's discovery. The jury could also infer that Gaona assisted Lutz in concealing Galvan's body, knowing that Galvan had been murdered, in order to prevent Galvan's body from being discovered. Applying the appropriate standard of review, we hold that the evidence is sufficient to support Gaona's conviction, either as a principal or a party, for tampering with a corpse.

We overrule issue two in Gaona's initial brief.

B. Cruel and unusual punishment. Gaona argues that his sentence was not proportional to the offense committed, violating his rights under the United States and Texas Constitutions to be free from cruel and unusual punishment. *See* U.S. CONST. amend. VIII, XIV; TEX. CONST. art. I, § 13. Specifically, Gaona argues that because he was given the maximum sentence on each count, his sentence "exceeds the sentence imposed on other criminals in the same jurisdiction and the sentence imposed for commission of the same crime in other jurisdictions."

A disproportionate sentence claim must be preserved for appellate review either by objecting when the sentence is imposed or by raising the claim in a timely-filed motion for new trial. TEX. R. APP. P. 33.1(a)(1); *Castaneda v. State*, 135 S.W.3d 719, 723 (Tex. App.—Dallas 2003, no pet.) ("Constitutional rights, including the right to be free from cruel and unusual punishment, may be waived") (citing *Rhoades v. State*, 934 S.W.2d 113, 120 (Tex. Crim. App. 1996)). Gaona did not raise this objection at the time

sentence was imposed. Gaona filed a motion for new trial, but it contained only the general contention that his sentence was "contrary to the law and the evidence."

In order to preserve error for appellate review, the record must show that an objection "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a)(1)(A). A point of error on appeal must comport with the objection made at trial, and a party's failure to properly object can result in the forfeiture of even a constitutional error. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012).

> While no "hyper-technical or formalistic use of words or phrases" is required in order for an objection to preserve an error, the objecting party must still "let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it."

*Id*. (quoting *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009)).

A general complaint like the one raised in Gaona's motion for new trial does not preserve error for appellate review. *See Rhoades*, 934 S.W.2d at 119 ("We have long held that, for an issue to be preserved on appeal, there must be a timely objection which specifically states the legal basis for that objection."); *see also Castaneda*, 135 S.W.3d at 723 n.1 ( phrase "the verdict is contrary to the law and the evidence" in motion for new trial insufficient to preserve issue for appeal); *Neal v. State*, No. 05-19-00699-CR, No. 05-19-00824-CR, 2020 WL 3958192, at *2 (Tex. App.—Dallas July 13, 2020, no pet.) (mem. op., not designated for publication) (general complaint that "verdict is contrary to the

law and the evidence" in motion for new trial insufficient to preserve complaint that punishment was excessive).

We overrule issue one in Gaona's first supplemental brief.

C.  Evidence of Sexual Assaults Committed by Victim.  In the second issue in his second supplemental brief, Gaona asserts that the trial court erred in excluding evidence that Galvan sexually assaulted several members of Gaona's family.

We review the trial court's ruling on the admission of evidence for an abuse of discretion.  *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018); *see also De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009) ("[A] trial court's ruling on the admissibility of extraneous offenses is reviewed under an abuse of discretion standard.").  "Under this standard, the trial court's decision to admit or exclude evidence will be upheld as long as it was within the 'zone of reasonable disagreement.'" *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018) (citing *McGee v. State*, 233 S.W.3d 315, 318 (Tex. Crim. App. 2007)).  "If the trial court's evidentiary ruling is correct under any applicable theory of law, it will not be disturbed even if the trial court gave a wrong or insufficient reason for the ruling."  *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016).

The trial court granted the State's motion in limine to exclude any "alleged bad acts" committed by Galvan.  The State objected when Gaona attempted to testify regarding the sexual allegations against Galvan, arguing that the evidence was not relevant because it had nothing to do with the state of mind of either Gaona or Galvan. During a voir dire examination, Gaona testified that he told the cartel crew about

Galvan's sexual abuse of his relatives and that Primo said he was going to "execute" Galvan. The State again argued that any allegations of sexual abuse by the victim were not relevant and that any testimony that someone may have said, "I'm going to kill him" is inadmissible hearsay. When the trial court inquired as to whether the proposed testimony was based on hearsay, Gaona's attorney responded that the statements consisted of "present sense impression" and "excited utterances." The trial court sustained the State's objection regarding allegations of sexual abuse.

Gaona does not challenge the exclusion of the evidence under Rule 404(b), but rather asserts that the evidence should have been admissible as relevant under Rule 401. Gaona specifically argues that his mother's testimony that Galvan went to the Alvaredo property on May 21st to address a plumbing issue "contradicted and undermined [Gaona's] claim that [Galvan] was deeply involved in the narcotics trade and at the Property for that reason." Under Gaona's theory, if he had been allowed to offer proof that Galvan sexually abused family members whose outcries were ignored by Gaona's mother, that would have led to the conclusion that she would also "have accepted or ignored [Galvan's] involvement in drugs." Gaona's assertion is that

> [i]f [Gaona's mother] tolerated/supported [Galvan's] illegal conduct and [Galvan] had reasons associated with the illegal drug trade to visit the Property, then the proffered testimony [regarding the sexual abuse] had a tendency to make it more likely that [Galvan] was involved in the illegal drug trade and that his murder resulted from "skimming" from the cartel.

The issue Gaona raised in the trial court is not consistent with the issue raised in this appeal and is, therefore, not preserved. *See* Tex. R. App. P. 33.1(a)(1)(A); *see also Clark*, 365 S.W.3d at 339. In order to preserve an issue for appellate review, a

complaining party must make a *specific* objection that corresponds with the objections and arguments made at trial. *See Dixon v. State*, 2 S.W.3d 263, 273 (Tex. Crim. App. 1998) (op. on reh'g).

We overrule issue two in Gaona's second supplemental brief.

D. Jury Charge Error. Gaona argues that the trial court erred in giving an instruction regarding the law of parties because the evidence did not support such a charge as it related to the charge of murder. Gaona did not raise this objection at trial.

The jury charge gave a general law of parties instruction and applied it to both the murder charge and the tampering with evidence charge. Gaona does not object to the instruction as it relates to the tampering charge.

Assuming without deciding that the trial court erred, we must then analyze the error for harm. *Brock v. State*, 495 S.W.3d 1, 13 (Tex. App.—Waco 2016, pet. ref'd). If error was not preserved by a proper objection, reversal will be granted only if the error presents egregious harm; meaning that the appellant did not receive a fair and impartial trial. *Id.*

If the evidence clearly supports a defendant's guilt as a principal actor, any error of the trial court in charging on the law of parties is harmless. *Cathy v. State*, 992 S.W.2d 460, 466 (Tex. Crim. App. 1999); *see also Ladd v. State*, 3 S.W.3d 547, 565 (Tex. Crim. App. 1999) ("[B]ecause there was no evidence tending to show appellant's guilt as a party, the jury almost certainly did not rely upon the parties instruction in arriving at its verdict, but rather based the verdict on the evidence tending to show appellant's guilt as a principal actor."); *see also Walter v. State*, 588 S.W.3d 682, 688 (Tex. App.—Eastland

2019, pet. ref'd) ("An appellant is not harmed by the inclusion of an instruction on the law of parties if the jury 'almost certainly did not rely upon the parties instruction in arriving at its verdict, but rather based the verdict on the evidence tending to show appellant's guilt as a principal actor.'") (quoting *Ladd*, 3 S.W.3d at 565); *Nunez v. State*, 215 S.W.3d 537, 544 (Tex. App.—Waco 2007, pet. ref'd) ("[W]hen the evidence clearly supports a defendant's guilt as a principal actor, an error in charging on the law of parties is harmless.").

The evidence, as previously outlined, clearly supported Gaona's guilt as a principal not as a party. There was no evidence in the record that Gaona was a party to Galvan's murder nor was any such argument made by either the State or Gaona. Even if the trial court erred in charging on the law of parties as it relates to murder, such error is harmless because the evidence clearly supports Gaona's guilt as a principal to Galvan's murder.

We overrule issue three in Gaona's second supplemental brief.

### Conclusion

Having overruled all of Gaona's issues, we affirm the judgments of the trial court.


MATT JOHNSON
Justice

Before Chief Justice Gray,
     Justice Johnson, and
     Justice Smith
Affirmed
Opinion delivered and filed November 3, 2021
Do not publish
[CRPM]

